IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-02961-PAB-KMT

CHARLES D. LEONE, II,

     Plaintiff,

v.

STEVEN C. OWSLEY and
DREW M. HAYWORTH,

     Defendants.

_____

### ORDER
_____

     This matter is before the Court on Defendants' Motion for Summary Judgment and Supporting Brief (filed under restrictions) [Docket Nos. 69/72] filed by defendants Steven C. Owsley and Drew M. Hayworth and Defendants' Motion to Strike Plaintiff's Jury Demand.  Docket No. 123.  This case arises out of defendants' valuation of plaintiff Charles D. Leone's interest in the limited liability company ("LLC") Madison Street Partners ("MSP").

## I.  BACKGROUND

     The following facts are undisputed unless otherwise indicated.  MSP is a registered investment advisor that manages several hedge funds.  Docket No. 72 at 2, ¶ 1; Docket No. 98 at 2.  MSP earns a profit by charging management and incentive fees for managing investor assets.  Docket No. 72 at 2, ¶ 2; Docket No. 98 at 2. Management fees are a fixed percentage of the assets' value, while incentive fees are based on the performance of the managed funds.  Docket No. 72 at 2, ¶ 3; Docket No.

98 at 2.

As of August 1, 2005, MSP had six members: plaintiff, defendants, Christopher Rule, another individual, and an LLC.  Docket No. 72 at 3, ¶ 5; Docket No. 98 at 2.  At all relevant times, MSP was governed by an Operating Agreement.  Docket No. 72 at 3, ¶ 4; Docket No. 98 at 2.  From August 2005 until his resignation in 2012, plaintiff was a "principal" under the Operating Agreement with a 19.75% interest in MSP.  Docket No. 72 at 3, ¶ 5; Docket No. 98 at 2.  Defendants are managers of MSP under the Operating Agreement.  Docket No. 72 at 3, ¶ 6; Docket No. 98 at 2.

The Operating Agreement provides that, if a member's status as a principal terminates, MSP "shall, until the tenth (10th) day following [the change in status], have the right, but not the obligation, to acquire" the member's interest, "in whole or in part." Docket No. 1-2 at 20-21.  If MSP declines to purchase the interest, the other members may elect to do so within twenty days after the change in status.  *Id*. at 21.  The repurchase price "shall be equal to the amount that the owner of the [interest] would receive if the assets of [MSP] were sold for their fair market value, as determined in good faith by the Managers . . . and the proceeds of the sale were distributed to the Members."  *Id*. at 22.  The Operating Agreement does not specify a method by which the managers must value a member's interest.  Docket No. 72 at 5, ¶ 17; Docket No. 98 at 2.  In spring 2012, Mr. Rule committed suicide; neither MSP nor defendants purchased the interest in MSP belonging to Mr. Rule's estate.  Docket No. 98 at 5, ¶ 7; Docket No. 105 at 3.

Plaintiff testified at his deposition that, in the spring and summer of 2012, defendants told him that they had the right under the Operating Agreement to terminate

2

his employment.  Docket No. 97-1 at 9, 10 (Leone dep., at 80, ll.13-19 and 92, ll.4-12).

Defendant Hayworth testified that Matt Arnett, MSP's Compliance Officer, prepared a

brochure, referred to as a "Pitch Book," in early July 2012 that did not list plaintiff as a

principal of MSP and that Mr. Hayworth subsequently reviewed the Pitch Book,

although Mr. Hayworth did not state when he reviewed the Pitch Book or when it was

sent to investors.  Docket No. 97-1 at 17 (Leone dep., at 125, l.16 to 126, l.23); Docket

No. 97-3 at 5 (Hayworth dep., at 41, l.10 to 42, l.5).

On August 2, 2012, plaintiff resigned as a principal of MSP.  Docket No. 72 at 4,

¶ 10; Docket No. 98 at 2.  In his resignation letter, plaintiff stated that it was

"unconscionable and illegal that unauthorized personal expenses have been run

through the company's credit card"; that MSP's performance had suffered since 2009

because "the trading department run by Steve decided to start trading the value

portfolio ad hoc to the detriment of the firm's return"; and that plaintiff could no longer

"support Drew's uncontrolled trading activity that has resulted in large losses over the

last few years" because he "no longer wish[ed] to see [his] profits negated by Drew's

large losses."  Docket No. 98-2 at 2.  Defendants were disappointed by the allegations

of mismanagement contained in plaintiff's letter of resignation and read the letter to

mean that plaintiff wished to sever his relationship with MSP.  Docket No. 98 at 4-5, ¶ 6;

Docket No. 105 at 3.  Accordingly, they determined that plaintiff would not be permitted

to retain his stake in MSP.  *Id*.

Acting in their capacity as managers, defendants first decided that MSP would

not repurchase plaintiff's interest.  Docket No. 72 at 4, ¶ 11; Docket No. 98 at 3.

Defendants, however, elected to purchase plaintiff's interest themselves.  Docket No.

72 at 4, ¶ 12; Docket No. 98 at 3.  Under the Operating Agreement, defendants were responsible for determining the price of plaintiff's interest.  Docket No. 72 at 4, ¶ 13; Docket No. 98 at 2.  Defendants contend that they had "no experience or training in valuing a hedge fund . . . like MSP for purposes of buying an owner's interest in such a company."  Docket No. 72 at 4, ¶ 13.  Plaintiff denies this contention on the basis that (1) defendants had worked in the financial industry since they each graduated from college and had managed MSP since its founding in 2004; (2) Mr. Owsley has a degree in finance and both defendants have passed the Series 7 licensing exam;[1] (3) Mr. Hayworth became a Chartered Financial Analyst in 2000; and (4) both defendants' "job responsibilities include looking for opportunities where companies may be over or under valued."  Docket No. 98 at 3-4, ¶ 1.  Plaintiff's assertion regarding defendants' job responsibilities is not supported by the evidence cited; there is no evidence that defendants' training or experience gave them the ability to value an owner's interest in a privately held hedge fund.  *See* Docket No. 98 at 4, ¶ 1 (citing Docket No. 97-2 at 3 (Owsley dep., at 11, l.20 to 13, l.23) and Docket No. 97-3 at 3 (Hayworth dep., at 9, l.11 to 12, l.10)).

In order to value plaintiff's interest, defendants hired two independent valuation firms, St. Charles Capital, LLC ("St. Charles") and INTRINSIC.  Docket No. 72 at 4, ¶ 14; Docket No. 98 at 3.  Defendants had no previous business relationship with either firm.  Docket No. 72 at 5, ¶ 18; Docket No. 98 at 2.  Defendants provided the valuation

---

[1]A Series 7 license is "required in order to trade in corporate securities, other than commodities and futures."  *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1309 n.3 (10th Cir. 2006).

firms with all the documents and information that the firms requested.  Docket No. 72 at 4, ¶ 20; Docket No. 98 at 2.  Plaintiff does not claim that the firms were unqualified to value a company such as MSP.

The only previous valuation of MSP had been performed by Duff & Phelps in 2009 and was not intended for use in determining the fair market value of a member's interest.  Docket No. 72 at 4-5, ¶ 15; Docket No. 98 at 3.  The Duff & Phelps report concluded that MSP was worth between $50,000,000 and $65,000,000.  Docket No. 98 at 11, ¶ 40; Docket No. 105 at 7, ¶ 40.  Defendants were reluctant to provide the valuation firms with a copy of the Duff & Phelps report and, after they did so, they argued to the firms that the report was not relevant.  Docket No. 98 at 10, ¶ 35; Docket No. 105 at 6, ¶ 35.  Both St. Charles and INTRINSIC were aware of the Duff & Phelps report at the time they conducted their analyses.  Docket No. 72 at 5, ¶ 16; Docket No. 98 at 2; *see* Docket No. 97-5 at 10 (Cashman dep., at 50, l.11 to 51, l.2) (discussing reliance on Duff & Phelps report in calculating discount rate).

In early August 2012, Mr. Owsley first spoke with Adam Fiedor, a St. Charles employee, about defendants' interest in valuing MSP.  During that conversation, Mr. Owsley told Mr. Fiedor that a partner was leaving MSP, that the situation was not amicable, and that a valuation was needed to facilitate a buyout.  Docket No. 98 at 6, ¶ 14; Docket No. 105 at 3; Docket No. 97-7 at 3-4 (Fiedor dep., at 19, l.20 to 21, l.16). Mr. Owsley portrayed MSP as struggling to Mr. Fiedor.  Docket No. 97-7 at 4 (Fiedor dep., at 23, ll.6-12).  At the time, MSP had been in business for about eight years, had no debt, and was managing nearly $150,000,000 in assets.  Docket No. 98 at 7, ¶ 19; Docket No. 105 at 4, ¶ 19.  Assets under management had decreased to that level from

5

a high of 405 million in September 2008.  Docket No. 98-6 at 4.  Mr. Owsley told St.

Charles to consider the decline in MSP's assets under management.  Docket No. 98 at

8, ¶ 23; Docket No. 105 at 5, ¶ 23.  Defendants told St. Charles that one reason MSP's

assets under management were declining was that plaintiff took business from MSP

when he left.  Docket No. 98 at 9, ¶ 29; Docket No. 105 at 6, ¶ 29.  Plaintiff did not take

clients with him when he left MSP.  Docket No. 98 at 9, ¶ 29; Docket No. 105 at 6, ¶ 29.

Plaintiff and his parents collectively withdrew close to one million dollars from MSP

funds when plaintiff left.  Docket No. 104-4 at 5 (Leone dep., at 213, l.15 to 215, l.7).

Defendants told St. Charles to consider the poor performance of other small hedge

funds in the current market.  Docket No. 98 at 8, ¶ 24; Docket No. 105 at 5, ¶ 24.

Defendants did not tell the valuation firms that MSP sent monthly newsletters to

its clients and did not provide copies of the newsletters to the firms.  Docket No. 98 at

10, ¶ 33; Docket No. 105 at 6.  MSP's July 2012 newsletter, which contains detailed

information about the performance of MSP's investment funds, states that MSP's

portfolio had posted a net gain of 2.65% since the start of the month.  Docket No. 98 at

10, ¶¶ 31-32; Docket No. 105 at 6, ¶¶ 31-32.  It also states that MSP anticipated a "very

choppy and volatile investment climate for the balance of the year."  Docket No. 98-10

at 2.  The letter does not indicate that MSP was "struggling."  Docket No. 98 at 10, ¶ 32;

Docket No. 105 at 6, ¶ 32.

St. Charles produced a valuation report based on (a) the information provided by

MSP, (b) publicly available information, and (c) its expert assessment of MSP's likely

future performance.  Docket No. 72 at 6, ¶ 23; Docket No. 98 at 2.  St. Charles' report is

based on a total revenue for 2011 of $5.892 million and a total net income for 2011 of

$2.21 million.  Docket No. 118-2 at 2-3, (Brustkern dep., at 148, ll.1-7 and 149, l.16 to

150, l.1).  These numbers are lower than those listed in MSP's internal profit and loss

statement, which indicates a total revenue for 2011 of $7.289 million and a net income

for 2011 of $3.398 million.[2]  *Id.* at 2 (Brustkern dep., at 146, ll.8-12 and 147, ll.16-20).

Mitchell Hoffman, plaintiff's expert witness, testified at his deposition that "it was difficult

to discern from the St. Charles report that they saw really anything that they considered

to be particularly favorable about the company."[3]  Docket No. 97-6 at 7 (Hoffman dep.,

---

[2]Plaintiff characterizes this as "[d]ocumentary evidence which establishes that Defendants produced incomplete and disparate financial data and income statements to Intrinsic and St. Charles."  Docket No. 119 at 5.  In addition, plaintiff asserts that the "financial statements Defendants produced to Intrinsic and St. Charles do not conform to generally accepted accounting principles (GAAP).  The differences between GAAP's and MSP's reporting for the year ended December 31, 2011 have a material impact on the net reported income.  Defendants also produced two very different income statements for the year ended December 31, 2011."  Docket No. 119 at 5 n.7.  These facts were asserted for the first time in the supplemental response brief that the magistrate judge permitted plaintiff to file after the magistrate judge struck evidence that plaintiff relied on in his initial response to the motion for summary judgment.  *See* Docket No. 114.  The magistrate judge did not grant plaintiff leave to respond to defendant's reply brief by filing a surreply, a pleading that is not provided for under Local Rule 7.1(d), although it appears that plaintiff proceeded to file a surreply in any case.  *See Collins v. BAC Home Loans Servicing LP*, 912 F. Supp. 2d 997, 1008 (D. Colo. 2012) ("Surveying the content of the instant motion, the court finds it is primarily rebuttal to Defendant BAC's argument that Plaintiff's claims are barred by *res judicata*. . . . Plaintiff's submission is clearly a prohibited surreply.") (internal citation omitted).  However, since defendant has had an opportunity to respond to plaintiff's supplemental response, *see* Docket No. 126, the Court will not strike it.  *See Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005).  Based on the cited evidence, a reasonable juror could conclude that St. Charles used revenue and income figures that were lower than those in MSP's internal financial documents.  The cited evidence does not establish that MSP produced non-GAAP-compliant financial information to St. Charles or indicate the reason that St. Charles' figures differed from those of MSP.  *See, e.g.*, Docket No. 118-2 at 2-3 (Brustern dep., at 148, l.17 to 149, l.15).

[3]Plaintiff relies on Mr. Hoffman's opinion that defendants acted in bad faith with respect to the St. Charles valuation.  Docket No. 98 at 11, ¶ 37 (citing Docket No. 97-6 at 6-7 (Hoffman dep., at 52, l.20 to 53, l.21)).  Defendants argue that this is a

at 53, ll.2-5).

According to Joshua Cashman, an employee of INTRINSIC, Mr. Owsley

instructed INTRINSIC to perform a "back of the envelope" valuation, or a calculation

report, which is a "rougher" financial assessment than a valuation report and which

does not provide an opinion of value.  Docket No. 72 at 6, ¶ 24; Docket No. 98 at 2 and

6, ¶ 11; Docket No. 105 at 3.  Mr. Owsley told Mr. Cashman that there was a high

probability of conflict or dispute and that the report was intended to serve as a tool in

the context of a negotiation.[4]  Docket No. 98 at 6, ¶ 15; Docket No. 105 at 3; *see also*

Docket No. 98-5 at 2 (Mr. Cashman's notes stating that defendants were "looking for a

valuation metric that they [could] use to make the negotiation smoother").  Mr. Owsley

told Mr. Cashman to use what is referred to as a "Monte Carlo" option[5] approach in the

_____

conclusory opinion that does not support any relevant facts.  Docket No. 105 at 3, ¶ 13;
*see* Fed. R. Evid. 56(c)(2) ("A party may object that the material cited to support or
dispute a fact cannot be presented in a form that would be admissible in evidence.").
The Court finds that Mr. Hoffman's opinion regarding defendants' bad faith is an
inadmissible legal conclusion.  *See  See Specht v. Jensen*, 853 F. 2d 805, 808 (10th
Cir. 1988) ("testimony which articulates and applies the relevant law, however,
circumvents the jury's decision-making function by telling it how to decide the case");
*Etherton v. Owners Ins. Co.*, No. 10-cv-00892-PAB-KLM, 2013 WL 68702, at *4 (D.
Colo. Jan. 7, 2013) (excluding expert opinion that insurance company acted in bad faith
as impermissible legal conclusion).

[4]Plaintiff asserts that Mr. Owsley "told Mr. Cashman he was reluctant to pay
Plaintiff a lot."  Docket No. 98 at 7, ¶ 16.  This assertion is unsupported by the cited
deposition testimony, which indicates that Mr. Owsley told Mr. Cashman that he was
reluctant to pay INTRINSIC a high fee for the valuation.  *See* Docket No. 97-5 at 4
(Cashman dep., at 21, ll.5-8) ("I expressed to [Mr. Owsley] that the three points that he
emphasized, two of which were timing and price, that we couldn't satisfy those two with
a full-blown appraisal.").

[5]Mr. Cashman testified at his deposition that a Monte Carlo option is a
"stochastic method where you apply some randomness to each variable and . . . you
play it out within a range of possibilities in an iterative manner and you wind up with . . .

calculation report.  Docket No. 98 at 7, ¶ 20; Docket No. 105 at 4, ¶ 20.  Mr. Hayworth

told INTRINSIC to take into account the poor outlook for small hedge funds at the time.

Docket No. 98 at 8, ¶ 24; Docket No. 105 at 5, ¶ 24.  Mr. Owsley told Joshua Harrison,

another INTRINSIC employee, that MSP "had some really adverse developments,

including . . . the suicide of a key individual with the fund," Mr. Rule.  Docket No. 118-1

at 3 (Harrison dep., at 40, ll.15-18).  Mr. Owsley told Mr. Harrison that plaintiff's

departure from MSP was an "adverse development" because he was "pretty involved

with the day-to-day operations" and that it was "just another negative signal to the

market that things aren't going right."  *Id*. at 3, 5 (Harrison dep., at 40, ll.18-19 and 48,

ll.2-16).  Defendants did not provide INTRINSIC with copies of MSP's tax returns.

Docket No. 119 at 5 n.7; Docket No. 126 at 6.

   INTRINSIC initially used a ten-year time frame in its calculation report, but Mr.

Owsley reviewed the draft report and told INTRINSIC to use a two-year time frame on

the basis that Mr. Owsley was not certain that MSP would be around for more than two

years.  Docket No. 98 at 7-8, ¶ 21; Docket No. 105 at 4.  Mr. Owsley told INTRINSIC to

take into account only incentive fees and disregard management fees.  Docket No. 98

at 8, ¶ 22; Docket No. 105 at 4, ¶ 22.  INTRINSIC also provided defendants with an

electronic spreadsheet that allowed defendants to plug in different numbers for relevant

variables to demonstrate how different variables would alter the calculated value of the

company.  Docket No. 98 at 7, ¶ 17; Docket No. 105 at 3.

   The two valuation firms arrived at similar conclusions: St. Charles found that

---

the Brownian motion outcome, which results in some form of distribution combustion."
Docket No. 97-5 at 5 (Cashman dep., at 25, ll.3-13).

plaintiff's interest on August 10, 2012 was worth between $126,400 and $158,000 and INTRINSIC found that it was worth between $109,000 and $150,000.  Docket No. 72 at 6, ¶ 26; Docket No. 98 at 2.  Defendants set the repurchase price at the average of the midpoints of the two ranges, or $135,850.  Docket No. 72 at 6, ¶ 27; Docket No. 98 at 2.

In his expert report, Mr. Hoffman criticizes INTRINSIC's report on the basis that (1) it was not a full valuation report; (2) it only considers incentive fees and not other sources of income; (3) it compares MSP to the S&P 500 as opposed to the HFRI Hedge Fund (Total) Index; (4) it is based on unreasonable assumptions regarding the exercise period for options; (5) it is based on an unreasonable discount rate; (6) it is based on an unreasonable long-term growth assumption; (7) it inappropriately applies a discount rate for lack of control; and (8) it relies on an unreasonable discount rate for lack of marketability.  Docket No. 98-4 at 21.

Mr. Hoffman criticizes St. Charles' report on the basis that (1) it is based on an unreasonable applied equity discount rate; (2) it is based on an unreasonable discount rate for lack of marketability; (3) it is not based on a "waterfall" analysis to estimate future fees; (4) it is based on unreasonable near-term new customer and market value growth assumptions; and (5) it is based on an inappropriate choice and application of guideline company multiples.  Docket No. 98-4 at 30.

Mr. Hoffman performed an initial calculation in fall 2012 and determined that plaintiff's interest in August 2012 was worth $1,500,000; after reviewing MSP's financials, he prepared a report concluding that plaintiff's interest was worth

$2,100,000.[6]  Docket No. 98 at 11, ¶ 38; Docket No. 105 at 7.

Plaintiff testified at his deposition that his stake should be "a lot, lot higher than $135,000" based upon the incentive and management fees he anticipates he would have received had he remained at MSP.  Docket No. 97-1 at 7 (Leone dep., at 58, l.8 to 59, l.24).  He testified that "the assets basically dropped about 50 percent" between the Duff & Phelps valuation and the valuations at issue in this case, "but yet the number that they determined to be fair value dropped by about 90 percent."  *Id*. at 7 (Leone dep., at 57, ll.1-3).  Plaintiff also testified that "any reasonable person who has an understanding of what's going on would–would know that $135,000 amount of money they tried to shove down my throat was ridiculous."  Docket No. 98 at 11, ¶ 39.  Robert Shields, a professional securities trader who previously worked with Mr. Hayworth at a different investment firm, testified at his deposition that, based on his knowledge of MSP's "returns since they opened," assets under management, and the growth of the company, he believes that the buyout price is "just extremely low" and "not even a realistic ballpark."  Docket No. 97-9 at 3, 6 (Shields dep., at 26, ll.22-23 and 59, ll.1-7).

On September 11, 2012, within a month of telling St. Charles and INTRINSIC that he did not believe MSP was doing very well, Mr. Hayworth sent an email to his father stating: "I wish I could buy the stake because for once in a long time the firm is

---

[6]Plaintiff seeks to introduce his own deposition testimony that Matt Daniel, a former employee of MSP, "did some back of the envelope calculations and told Plaintiff that he believed Plaintiff's stake in MSP was worth about $2,000,000."  Docket No. 98 at 12, ¶ 41.  Plaintiff's testimony on this point is inadmissible because it is hearsay that is not within an exception to the rule.  *See* Fed. R. Evid. 801(c).

on stable grounds."[7]  Docket No. 98-12 at 2.

On September 19, 2012, plaintiff requested copies of MSP's tax returns and

audited financials for the past five years so that he could evaluate defendants' buyout

offer.  Docket No. 98 at 13-14, ¶ 50.  Defendants refused to produce the documents.

*Id.*

On May 21, 2013, the publication Insider Monkey published an analysis

indicating that MSP was in the top fifty out of four hundred hedge funds for value-

weighted returns in the second and third quarters of 2012.  Docket No. 98 at 14, ¶ 51;

Docket No. 105 at 8, ¶ 51.

On June 27, 2013, plaintiff sent a letter to Mr. Owsley stating that plaintiff was

part of a consortium that would pay $1,000,000 for Mr. Owsley's 50.875% interest in

MSP.  Docket No. 98 at 13, ¶ 45; Docket No. 105 at 7, ¶ 45.  The other members of the

consortium were Mr. Shields and Henry Robertelli, another professional securities

trader.  Docket No. 98 at 13, ¶ 46; Docket No. 105 at 8.  Mr. Owsley never responded

to the offer.  Docket No. 98 at 13, ¶ 47; Docket No. 105 at 8.

A performance review released by Hedge Weekly states that, as of October

---

[7]Plaintiff states that, in June 2012, Mr. Owsley bought a three million dollar home in Cherry Hills Village, which, plaintiff argues, contradicts Mr. Owsley's statements to the valuation firms that MSP was not worth very much.  Docket No. 98 at 12, ¶ 44. Plaintiff's only evidence in support of the contention that Mr. Owsley made this purchase is an email from Mr. Shields, stating: "Steve bought this house for 3m.  closes [sic] Friday."  Docket No. 97-12.  The email contains a link to a public listing for a home in Cherry Hills Village.  *Id.*  Defendants argue that this exhibit is inadmissible hearsay. Docket No. 105 at 7, ¶ 44.  In its current form, this evidence is hearsay not within an exception, *see* Fed. R. Evid. 801(c), and there is no evidence that the declarant, Mr. Shields, has personal knowledge of the transaction as required to render his testimony on this matter admissible at trial.  *See* Fed. R. Evid. 56(c)(2), (4).

2013, MSP's investment funds were up 19.18% for the year.  Docket  No. 98 at 14,

¶ 53; Docket No. 105 at 8, ¶ 53.

On November 12, 2012, plaintiff filed this case.  Docket No. 1.  Plaintiff alleges

that defendants (1) breached the Operating Agreement by failing to act in good faith in

obtaining a valuation of plaintiff's interest and (2) breached the covenant of good faith

and fair dealing implied in the Operating Agreement by attempting to force plaintiff to

sell his stake at less than fair market value and by refusing to produce the financial

documents that plaintiff requested.  Docket No. 1 at 9-11, ¶¶ 54-63.  Plaintiff seeks

compensatory and punitive damages, interest, attorney's fees, and costs.  *Id*. at 11.

Defendants have moved for summary judgment on both of plaintiff's claims.

Docket Nos. 69/72.  In addition, defendants move to strike plaintiff's demand for a jury

trial.  Docket No. 123.  Plaintiff opposes both motions.  Docket Nos. 97/98, 118/119,

and 125.

## II.  STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56, a court "shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see*

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986).  In pursuing summary

judgment, the moving party generally bears the initial burden of showing the absence of

a genuine dispute concerning a material fact in the case.  *Celotex Corp. v. Catrett,* 477

U.S. 317, 323 (1986).  However, "[w]hen, as in this case, the moving party does not

bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary

13

judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001).

"Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colorado, Inc. v. City & Cnty. of Denver,* 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex,* 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. However, to be clear, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell,* 555 F.3d 1097, 1110 (10th Cir. 2009). "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a

reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee,* 119

F.3d 837, 839 (10th Cir. 1997) (citing *Anderson,* 477 U.S. at 248).

## III.  ANALYSIS

### A.  Choice of Law

_____Pursuant to the terms of the Operating Agreement, the dispute in this case is

governed by Delaware law.  *See* Docket No. 72-1 at 25, Art. 15.4.  "Consistent with the

Restatement (Second) of Conflict of Laws § 187 (1971), [Colorado courts] apply the law

chosen by the parties unless there is no reasonable basis for their choice or unless

applying the chosen state's law would be contrary to the fundamental policy of the state

whose law would otherwise govern."  *Target Corp. v. Prestige Maintenance USA, Ltd.,* -

-- P.3d ----, 2013 WL 363324, at *2 (Colo. App. Jan. 31, 2013).  The parties do not set

forth, and the Court has not found, any reason to override the parties' own choice of law

in this case.  Docket No. 98 at 14-15; Docket No. 105 at 9 n.4.  Accordingly, the Court

will apply Delaware law.

### B.  Good Faith

Plaintiff alleges that defendants breached the Operating Agreement by failing to

value plaintiff's interest in good faith, attempting to force plaintiff to sell his interest for

less than fair market value, and refusing to produce updated financial documents.

Docket No. 1 at 9-11, ¶¶ 54-63.

 "Good faith performance or enforcement of a contract emphasizes faithfulness

to an agreed common purpose and consistency with the justified expectations of the

other party."  Restatement (Second) of Contracts § 205(a) (1981).  Defendants'

"personal knowledge and experience will be relevant to a subjective good faith determination, which must focus on measuring the [defendants'] approval of a transaction against their knowledge of the facts and circumstances surrounding the transaction." *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 107 (Del. Super. Ct. 2013).

Bad faith may be characterized by "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, [or] abuse of power to specify terms." Restatement (Second) of Contracts § 205(d). Bad faith is not "simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." *SIGA Technologies, Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 346 (Del. Super. Ct. 2013) (internal citation omitted); *see also Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993) ("[A] claim of bad faith hinges on a party's tortious state of mind.").

Under Delaware law, a manager of an LLC "shall be fully protected in relying in good faith . . . upon information, opinions, reports or statements" presented by any person on matters that the manager "reasonably believes are within such other person's professional or expert competence," including reports on the company's value. Del. Code Ann. tit. 6, § 18-406. To state a claim for bad faith conduct on the part of corporate directors, who are protected under Delaware law by a statute akin to § 18-

406,[8] a plaintiff must show that:

> (a) the directors did not in fact rely on the expert; (b) their reliance was not in good faith; (c) they did not reasonably believe that the expert's advice was within the expert's professional competence; (d) the expert was not selected with reasonable care by or on behalf of the corporation, and the faulty selection process was attributable to the directors; (e) the subject matter . . . that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice; or (f) [] the decision of the Board was so unconscionable as to constitute waste or fraud.

*Brehm v. Eisner*, 746 A.2d 244, 262 (Del. Super. Ct. 2000).

Plaintiff advances two theories under which defendants' reliance on outside experts does not immunize them from his bad faith claim. Docket No. 98 at 17. The first is that defendants acted in bad faith by relying on valuation figures that were clearly erroneous. *Id*. at 17-18. The second is that defendants wrongfully influenced the valuation firms in order to obtain a more favorable number. *Id*. at 17. The Court will begin by addressing plaintiff's first theory.

In *Senior Housing Capital, LLC v. SHP Senior Housing Fund, LLC*, 2013 WL 1955012, at *3 (Del. Ch. May 13, 2013), the court addressed the situation that where parties have contractually agreed to be bound by an appraiser's judgment:

> Unless the party unhappy with the appraiser's judgment can show that the appraised market value resulted from a concerted course of bad faith action between the appraiser and the other party–*i.e.*, a breach of contract by a party–or that the appraiser's result was otherwise tainted by the contractually improper conduct of the other party (such as intentionally providing the appraiser with false information to taint the valuation), the parties are stuck

---

[8]"A member of the board of directors . . . shall, in the performance of such member's duties, be fully protected in relying in good faith upon . . . any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation." Del. Code Ann. tit. 8, § 141(e).

with what they bargained for.

The court held that judicial review should concern itself, initially, with procedural defects

and that courts should be wary of engaging in unnecessary financial analysis:

> If one of the parties to the contract takes action to taint the appraisal process–for example, by providing the appraiser with false financial statements–a court can of course protect the injured party.  Such judicial review would not, however, involve second-guessing the good faith judgment of the appraiser or examining the appraiser's valuation judgments for consistency with a judge's understanding of relevant corporate finance principles.  It would instead involve a judge determining that a party had breached the contract's implied covenant of good faith and fair dealing, and that this breach, as its proximate result, deprived the appraiser's work of contractual integrity.

*Id.* at *26 (internal citation omitted).

*Senior Housing Capital* concerned a dispute between investors in Senior

Housing Capital, LLC, a fund formed to invest in retirement homes.  2013 WL 1955012,

at *1.  Under the terms of the LLC agreement, defendant California Public Employees'

Retirement System ("CalPERS") was contractually obligated to buy out the interest of

plaintiff SHP Asset Management ("SHP"), the fund's manager, at fair market value if

SHP withdrew from the fund.  *Id*.  The parties agreed that the value of SHP's interest

would be determined by an appraiser selected by CalPERS.  *Id*.  The agreement further

provided that, if a party were unhappy with the appraisal, it could request an additional

appraisal be performed by a different appraiser (also pre-approved by CalPERS) and

the two appraisal values would be averaged together.  *Id*. at *2.

CalPERS obtained an appraisal in accordance with the contract, but pressured

the appraisal firm to lower the appraised value.  *Id*.  CalPERS then triggered the dispute

resolution process in order to obtain a second appraisal from a different firm.  *Id*.  Since

the values reached by the two firms differed by more than five percent, a third appraisal was performed in accordance with the contract.  *Id*.  Plaintiff investors sued, arguing in part that CalPERS owed SHP a fee based on the value that the initial appraiser would have reached if CalPERS had not interfered.  *Id*.  CalPERS countered that SHP was demanding "payment based on erroneous appraisals that valued the [fund's assets] too highly."  *Id*.

The court found that it could properly consider the substantive fairness of the third-party appraisals because CalPERS had acted in bad faith by (1) persuading the first appraisal firm to increase the discount rate by one and a half percentage points;[9] (2) instructing the first appraisal firm to take into account a "'hypothetical condition,' under which $34 million, representing the value of supposed shortfalls in the Fund's cash flows over the previous three years, was deducted from the [assets'] value"; (3) triggering the dispute process in "an attempt to obtain a low value"; (4) pressuring the second appraisal firm to "deliver very low values"; and (5) pressuring the third appraisal firm "to deliver a low value."  *Id*. at *38-*39.  The managing director of the second valuation firm accused CalPERS of "'meddling' in the valuation process, with 'no data to support [its] arguments.'"  *Id*. at *38.  In light of CalPERS' bad faith conduct, the court calculated a new appraisal value for SHP's interest by disregarding the hypothetical condition that CalPERS imposed and lowering the discount rate to the level that the first valuation firm had initially applied.  *Id*. at *39.

---

[9]The managing director of the first appraisal firm testified that "he attempted to explain to [CalPERS] that the 11.5% figure was 'appropriate and reasonable and supportable,' but that [CalPERS] instructed [the firm] to go back to the market and find information supporting a 'much higher discount rate.'"  2013 WL 1955012, at *18.

In this case, plaintiff agreed to be bound by defendant's good faith determination of the repurchase price. *See* Docket No. 72-1 at 23. The Operating Agreement does not set forth a particular method that defendants were bound to use to calculate this price; it requires only that they act in good faith. *See id.* Since the parties agreed to be bound by defendants' determination of the repurchase price, the Court will not "second-guess[] the good faith judgment of the [valuation firms] or examin[e] the [valuation firms'] judgments for consistency with [the Court's] understanding of relevant corporate finance principles" absent evidence that defendants took "action to taint the [valuation] process–for example, by providing the [valuation firms] with false financial statements." *See Senior Housing*, 2013 WL 1955012, at *26. In other words, the Court cannot reach plaintiff's first theory without first considering his second theory.

With respect to his first theory, plaintiff also relies on *Rovakat, LLC v. Comm'r*, 102 T.C.M. (CCH) 264, 2011 WL 4374589, at *26 (T.C. 2011), for the proposition that an "individual who blindly relies on a professional opinion to support a facially too good to be true transaction . . . does so at his or her own peril." In *Rovakat*, the court held that the Internal Revenue Service ("IRS") correctly imposed tax penalties on Rovakat, LLC ("Rovakat") for a gross valuation misstatement with respect to a transaction in foreign currency. *Id.* at *8; *see also* 26 U.S.C. § 6662(a), (h). Rovakat argued that it had relied in good faith on two expert reports: the first report had been supplied by the counter-party in the foreign currency transaction without any involvement on Rovakat's part; the second report had been requested by the counter-party for his own benefit and was not provided to Rovakat until several years after Rovakat's underpayment of taxes.

*See id*. at *8, *26.  Rovakat argued that the penalty should not apply because Rovakat

had "reasonable cause" for the underpayment in taxes and had "acted in good faith"

with respect to the valuation.  *See id*. at *24 (citing 26 U.S.C. § 6664(c)(1)).

     The court explained that a taxpayer may establish that it acted with reasonable

cause and in good faith, *see* 26 U.S.C. § 6664(c)(1), where "(1) [t]he taxpayer

reasonably believed that the professional upon whom the reliance is placed is a

competent tax adviser with sufficient expertise to justify reliance; (2) the taxpayer

provided necessary and accurate information to the adviser; and (3) the taxpayer

actually relied in good faith on the adviser's judgment."  *Id*. at *25.  In assessing a

taxpayer's good faith reliance, the court considered "(1) the taxpayer's business

sophistication and experience, (2) the reasonableness of the advice solicited, and

(3) whether the advice was obtained as part of a tax shelter."  *Id*. at *26.

     The court found that Rovakat did not rely on the reports in good faith because

the reports' conclusion that Rovakat "realized a $5,769,532 loss as to a transaction that

resulted in a $1,283 economic gain" had "such obviously suspect tax claims as to put a

reasonable taxpayer under a duty of inquiry," especially a taxpayer like Rovakat, whose

tax partner was a "business executive with more than 20 years of experience and an

economics degree from the University of Pennsylvania."  *Id*.

     Unlike the defendant in *Rovakat*, defendants in this case did not "blindly" rely on

the expert opinions.  They selected two qualified firms to perform an analysis.  Plaintiff

admits that defendants "provided reams of financial information about MSP" to the

firms.  *See* Docket No. 98 at 22; *compare* 2011 WL 4374589, at *25.  The valuation

opinions of the two firms were similar, despite the lack of any evidence that the firms collaborated or reviewed each other's reports. *See* Docket No. 105-1 at 15-57. The situation here is unlike that in *Rovakat*, where the financial transaction was so clear-cut that defendant could not argue that it was substantively valid and instead chose to hide behind a bogus claim of "reliance" on expert advice. *See* 2011 WL 4374589, at *25-26. Rather, this case involves defendants relying on corroborative opinions from two separate valuation firms. *See City Partnership Co. v. Lehman Bros., Inc.*, 344 F. Supp. 2d 1241, 1250 (D. Colo. 2004) ("Valuation of closely held businesses is something of a black art. Experts try to project the firm's net cash flow into the future, then discount that stream to present value. This process is difficult for public companies, . . . and almost impossible for private companies, for which uncertainties abound.") (internal citation omitted). In this context, the Court should be guided by *Senior Housing Capital* and refrain from considering the substantive accuracy of the experts' conclusions absent evidence of procedural wrongdoing.

Plaintiff also likens this case to *Auriga Capital Corp. v. Gatz Properties, LLC*, 40 A.3d 839, 873 (Del. Ch. 2012), in which the court found that the defendant manager of an LLC acted in bad faith by holding a sham auction at which he purchased the company at an unreasonably depressed price after failing to properly explore other market alternatives, instead of engaging a broker with specialized industry knowledge to cultivate a targeted list of buyers with demonstrated interest in the company. The court found that the defendant was not shielded from liability by his reliance on the expertise of two attorneys in deciding to pursue the auction. *Id*. at 874 n.154. The defendant had

re-engaged one of the attorneys after he had already decided to hold the auction and did not ask the attorney about the fairness of the auction. *Id.* The other attorney was not qualified in the relevant area. *Id.* ("[The defendant] and his counsel chose a jejune scion of a distress sale shop to conduct a market check for a unique asset."). Finally, the court found that the defendant's claim of reliance was "undercut by his and his counsel's full involvement in the development and approval of the marketing plan and the Terms of Sale" and by the fact that the defendant "helped shape [the] aggressive squeeze-out strategy" that he then pursued. *Id.* Unlike the defendant in *Auriga*, defendants in this case did not retain an expert who was unqualified to perform the assigned task or intentionally mismanage the business to decrease the value of plaintiff's interest. *See* 40 A.3d at 874 n.154.

The Court turns now to the argument that defendants "wrongfully influence[d]" the valuation firms, resulting in reports that unfairly favored defendants over plaintiff. Docket No. 98 at 17. Drawing all reasonable inferences in favor of plaintiff, a juror could conclude that (1) defendants told the valuation firms that plaintiff's departure was not amicable and that they needed a valuation figure to facilitate a negotiation; (2) defendants wanted to terminate plaintiff's employment before he resigned and, because of plaintiff's resignation letter, defendants had negative feelings toward plaintiff at the time the valuations were conducted; (3) defendants are financially sophisticated and understand MSP's value as a company; (4) defendants characterized MSP as struggling, in part because of a decline in assets under management, and suggested that the company would not be around for more than two more years; (5) defendants told St. Charles that plaintiff took part of their book of business with him when he left,

even though he did not take any clients; (6) defendants intentionally withheld the investor newsletters from the valuation firms; (7) St. Charles used lower numbers for MSP's revenue and income than those listed on MSP's internal profit and loss statements; (8) defendants were reluctant to produce the Duff & Phelps report to the valuation firms and, after they produced it, argued that it was not relevant; (9) Mr. Hayworth sent an email in September 2012 stating that he wished he could purchase plaintiff's stake himself because MSP was finally on stable ground; (10) Mr. Owsley declined to sell his stake in MSP for $1 million; (11) defendants refused to produce "updated financials" to plaintiff; and (12) MSP's funds have gone up since August 2012.[10]

This evidence is not sufficient to permit a reasonable juror to infer that defendants engaged in the "conscious doing of a wrong because of dishonest purpose or moral obliquity."  *See SIGA Technologies*, 67 A.3d at 346.  As a general matter, the testimony of the individuals who conducted the valuations in this case does not indicate

---

[10]Plaintiff argues that defendants acted in bad faith by commissioning a calculation report, as opposed to a valuation report, from INTRINSIC and by interfering with INTRINSIC's valuation process in various ways.  Docket No. 98 at 17-19.  The Operating Agreement does not impose a particular valuation method on MSP's managers.  In fact, defendants were under no obligation to obtain a third-party valuation report, let alone two.  *See* Docket No. 72-1 at 23, 24.  Had defendants obtained only the St. Charles valuation report, they would have satisfied the terms of the Operating Agreement, so long as the report was obtained, produced, and relied on in good faith. *See id.*  Defendants' decision to obtain additional information from INTRINSIC–even if this information was not as thorough or robust as it could have been–does not support a finding of bad faith, particularly since the buyout figure is supported by St. Charles' valuation report.  *See* Docket No. 72 at 6, ¶¶ 26-27; Docket No. 98 at 2.  Accordingly, plaintiff's evidence regarding the insufficiency or inadequacies of INTRINSIC's report does not raise a genuine dispute of material fact, and the Court will focus its analysis primarily on whether the St. Charles report was commissioned and relied upon in good faith.

improper interference on defendants' part.  *Compare* Docket No. 69-8 at 3 (Fiedor dep., at 13, ll.7-9) ("I will testify that the way I conducted our valuation, they didn't influence our judgment, and what we stand behind is what was in the document.") *with Senior Housing Capital*, 2013 WL 1955012, at *19 ("Don Spradlin, a managing director at CBRE, accused Pottle of 'meddling' in the valuation process, with 'no data to support his arguments' and 'ignor[ing] the fact that our [date of valuation] is 10/08, now 11 months ago.'").  And review of the above-noted inferences also does not raise genuine issues of material fact.  Defendants' statements to the valuation firms that the situation was not amicable and that they needed a number to facilitate negotiations does not rise to the level of improperly pressuring the firms.  *Compare Senior Housing Capital*, 2013 WL 1955012, at *19.  An unreasonably low number would not facilitate negotiations, particularly with a principal who is upset with the company.  If anything, a reasonable valuation would facilitate negotiations in that context, assuming, as appears to be the case, that defendants contemplated some type of negotiations.

Plaintiff argues that defendants were angry at him and that they were "savvy enough" to manipulate the data in order to deprive him of the fair value of his stake.[11]

---

[11]Plaintiff also argues that, "[a]fter Defendants manipulated the numbers in the Excel spreadsheet provided by Intrinsic, Defendants could see how changing various assumptions such as [assets under management], rates of return and discount rates could devalue MSP."  Docket No. 98 at 19.  This argument–that the spreadsheet had a pernicious influence by revealing to defendants the importance to MSP's value of variables such as assets under management–undermines plaintiff's assertions that defendants were "savvy enough to manipulate the Intrinsic calculation report and the St. Charles valuation," Docket No. 98 at 4, ¶ 2, and that they were "sophisticated businessmen who had to have known that Intrinsic's and St. Charles' conclusions were way too low."  Docket No. 98 at 18.  In any event, a reasonable juror could not infer that defendants acted in bad faith simply because they had access to a tool demonstrating the impact of certain key variables on the value of plaintiff's interest.

Docket No. 98 at 4, 18, 20-21.  While these conditions provide circumstantial evidence of motive and means, it is important to note that they were contemplated by the Operating Agreement, which gives the managing partners the right to force the sale of a departing member's stake at a price to be determined solely by the managing partners. *See* Docket No. 72-1 at 23.  The possibility of a hostile separation and the fact of defendants' financial expertise are built into the bargain: it is the very likelihood of these conditions that obligates defendants to act in good faith.  Thus, these conditions cannot, on their own, support an inference that defendants acted in bad faith.

Plaintiff argues that defendants "flat lied" to the valuation firms "by stating that Plaintiff when he left MSP took with him a substantial book of business."  Docket No. 98 at 19-20.  Mr. Fiedor, the St. Charles employee who worked on the valuation, testified at his deposition that defendants told him that "part of the book of their business left with [plaintiff] when he departed."  Docket No. 97-7 at 6 (Fiedor dep., at 51, ll.1-4).  Mr. Fiedor also testified that defendants did not tell him how much business left and that he "measured the loss in [MSP's assets under management] based on the financials and the detail I had."  *Id*. at 51, ll.5-10.  Based on Mr. Fiedor's testimony, a reasonable juror could infer that defendants lied about plaintiff taking business with him, but it is not reasonable to infer that this lie materially impacted St. Charles' report.  *See Senior Housing Capital*, 2013 WL 1955012, at *26 (noting that any breach of the implied covenant of good faith must, "as its proximate result," have compromised the integrity of the third-party evaluation).

Plaintiff argues that defendants "produced incomplete and disparate financial data and income statements" to the valuation firms.  Docket No. 119 at 5.  The

26

evidence in support of this claim is that some of the numbers in St. Charles' report differ from those in an MSP profit and loss statement and on MSP's tax returns.  *See* Docket No. 118-2 at 2-3 (Brustkern dep., at 146, l.9 to 150, l.1).  However, there is no evidence that this discrepancy was improper or that St. Charles should have relied on different financial documents, such as MSP's tax returns.  *See id.* at 3 (Brustkern dep., at 152, ll.8 to 153, l.12) ("When I analyze a company, I look at–I try to find GAAP financials. Tax returns are not GAAP. . . . For that reason alone, we would never use a tax return and then compare those financial returns to a GAAP financial statement . . . .").  The inference that plaintiff seeks to draw is not reasonable.

Defendants' reluctance to produce the Duff & Phelps report does not alter the fact that they did produce the report to the valuation firms.  Moreover, there is no evidence that the valuation firms considered the report relevant to the 2012 valuation of MSP or would have considered it relevant had defendants not first been reluctant to provide it to them.

Plaintiff stresses the fact that defendants did not provide the investor newsletters to the valuation firms.  Docket No. 119 at 5.  However, there is no evidence that the information contained in the newsletters was relevant to valuation of MSP as opposed to valuation of the assets being managed or that such information was not available in the other financial documents that defendants provided.

Plaintiff argues that defendants painted a "doom and gloom" picture of MSP's condition in which they did not really believe even though "MSP had been in business since 2004, carried no debt, and was managing almost $150,000,000 in assets." Docket No. 98 at 19.  There is, however, no evidence that defendants gave St. Charles

27

any false information with respect to MSP's performance, that St. Charles was unaware of the facts that plaintiff cites in support of his contention that MSP was doing well, or that defendants required St. Charles to adopt inaccurate or unreasonable assumptions. *Compare Senior Housing Capital*, 2013 WL 1955012, at *38 *with* Docket No. 97-6 at 7 (Hoffman dep., at 55, l.9 to 56, l.3) ("And in the example I gave with respect to St. Charles, it isn't–it isn't asking [St. Charles] to change assumptions, but merely to consider things that may not have been considered.  And then St. Charles can draw whatever assumptions and apply whatever assumptions they need thereafter.").  The only admissible evidence plaintiff offers in support of his contention that defendants did not believe that the company was struggling is Mr. Hayworth's email and Mr. Owsley's failure to reply to the consortium's offer to buy his stake in the company.  However, as noted earlier, the fact that defendants had a motive to undervalue plaintiff's ownership in MSP does not constitute relevant evidence that defendants did undervalue plaintiff's stake.

Plaintiff argues that defendants' bad faith is evidenced by their "ongoing refusal to produce updated financials."  Docket No. 98 at 22.  Plaintiff speculates that the "updated financials would likely allow the jury to conclude that Defendants Owsley and Hayworth were indeed being dramatic when they told Intrinsic and St. Charles that MSP was struggling to the point that it might even go out of business."  *Id*. at 22-23.  Information regarding MSP's performance subsequent to the valuations was, by definition, not available at the time the valuations were conducted and cannot support an inference regarding MSP's prospects at the time of the valuations.  In addition, plaintiff contends that the figures discussed in the Hedge Weekly performance review

28

"mean[] that Plaintiff's 19.75% stake would have generated him $500,000 to $700,000 in 2013 alone."  Docket No. 98 at 23.  Plaintiff does not provide any evidentiary support for his calculation of anticipated incentive fees.  *See id*.  As explained below in Section III.C, defendants did not have a statutory or contractual duty to disclose MSP's financials to plaintiff and plaintiff does not offer any facts supporting a conclusion that their denial to do so evidences bad faith.  *See Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) ("Implying contract terms is an 'occasional necessity . . . to ensure [that] parties' reasonable expectations are fulfilled,' but '[t]his quasi-reformation . . . should be a rare and fact-intensive exercise, governed solely by issues of compelling fairness.") (internal citation omitted).

        In summary, there is no evidence that defendants provided material misinformation or withheld material information from St. Charles, that they pressured St. Charles to arrive at a particular result, that they presented MSP in a light they believed to be false, or that they imposed unreasonable assumptions on the firm's calculations. Based on this evidence, a reasonable juror could not infer that defendants "affirmatively operat[ed] with furtive design or ill will."  *See SIGA Technologies*, 67 A.3d at 346.  In other words, as stated above, plaintiff has failed to raise a genuine dispute of material fact as to the procedural integrity of the valuation and, accordingly, the Court will not entertain a substantive review of the financial calculations performed.  Since there is no genuine dispute of material fact on the issue of whether defendants valued plaintiff's interest in good faith, summary judgment is appropriate on plaintiff's first claim.  *See Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993) ("Summary judgment . . . may be appropriate, '[e]ven in cases where elusive concepts such as motive or

intent are at issue, . . . if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'") (internal citation omitted).

### C.  Examination of Records

Plaintiff alleges that defendants violated the covenant of good faith and fair dealing implied in the Operating Agreement by refusing to produce MSP's tax returns and other financial records for the years 2007 through 2012.  Docket No. 98 at 23-25.

An implied covenant of good faith and fair dealing attaches to every contract and requires contracting parties to "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits" of the agreement.  *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. Super. Ct. 2005) (internal citation omitted).  A party breaches the covenant through conduct that "frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms."  *Id*. at 442 (internal citation omitted).  "[T]here is no difference between 'bad faith' and 'a lack of good faith' in the context of the implied covenant of good faith and fair dealing."  *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 105 n.46 (Del. Super. Ct. 2013).

By virtue of the fact that the covenant is implied, it is typically implied in situations that are not governed by the express terms of an agreement.  *See Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. Super. Ct. 2010) ("The implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated.") (internal citation omitted).  When a party raises the covenant of good

faith, a court's "fact-intensive" analysis must "focus on what the parties likely would have done if they had considered the issues involved."  *Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) (internal citation omitted); *see also Dunlap*, 878 A.2d at 442.  A court will only impose implied contractual obligations when the party asserting a breach of the covenant "proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain," *Nemec*, 991 A.2d at 1125, and when the "contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." *Lonergan*, 5 A.3d at 1018 (internal citation omitted).  The covenant will not support the elaboration of a "free-floating duty [of good faith] unattached to the underlying legal document."  *Nemec*, 991 A.2d at 1126 n.18 (internal citation omitted).

The Operating Agreement is silent on the rights of MSP members to review the company's records or financial data.  *See generally*, Docket No. 72-1.  The only provision pertaining to financial records states that the "books of the Company shall be kept in accordance with the terms" of the Operating Agreement and shall be "kept at the principal place of business" of the company.  *Id*. at 24.  Plaintiff concedes that there is "no specific explicit provision of the MSP Operating Agreement that states that in connection with the buyout Defendants were required to produce the financials." Docket No. 98 at 25.  In addition, defendants argue, and plaintiff does not dispute, that plaintiff never established a right to examine the financial records under Delaware statutory law.  Docket No. 72 at 8, ¶¶ 29(b)(i)-(iv)  (citing Del. Code Ann. tit. 6, § 18-305(a), (f)); Docket No. 98 at 3.

Instead, plaintiff argues that defendants knew he wanted to see MSP's financials in order to evaluate the buyout offer and that the refusal to provide them was an underhanded and oppressive attempt to prevent plaintiff from receiving the fruits of his bargain under Section 10.2.  Docket No. 98 at 24-25.  Plaintiff asserts that if, "when originally executing the Agreement[,] the parties had discussed whether the member being bought out should have the right to examine MSP's financial records, they undoubtedly would have agreed that right should exist."  *Id*. at 25.  Plaintiff does not cite any facts in support of this assertion.

The express terms of the Operating Agreement undermine plaintiff's position insofar as they place responsibility for determining the repurchase price entirely with MSP's managers and do not reserve any role in the process for the departing member.  Docket No. 72-1 at 23, Art. 10.2(d) (the "'***Repurchase Price***' for the Repurchasable Interest shall be equal to the amount that the owner of the Repurchasable Interest would receive if the assets of the Company were sold for their fair market value, as determined in good faith by the Managers") (emphasis in original).  Plaintiff does not provide any basis, factual or legal, for finding a specific requirement that defendants open MSP's financial records to a departing member within defendants' more general implied duty to act in good faith.  Thus, plaintiff has not shown that the Operating Agreement "as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer."  *Lonergan*, 5 A.3d at 1018 (internal citation omitted).  In addition, as discussed in Section III.B above, plaintiff has not proven that defendants "acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain."  *Nemec*, 991 A.2d at 1126.

In sum, plaintiff has not raised a genuine dispute of material fact regarding defendants' alleged breach of the implied covenant of good faith and fair dealing.

## IV. CONCLUSION

Wherefore, it is

**ORDERED** that Defendants' Motion for Summary Judgment and Supporting Brief (filed under restrictions) [Docket No. 72] filed by defendants Steven C. Owsley and Drew M. Hayworth is GRANTED.  It is further

**ORDERED** that Defendants' Motion to Strike Plaintiff's Jury Demand [Docket No. 123] is DENIED as moot.  It is further

**ORDERED** that this case is CLOSED.


DATED April 10, 2014.

                                                    BY THE COURT:


                                                     s/Philip A. Brimmer
                                                    PHILIP A. BRIMMER
                                                    United States District Judge